UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America, Plaintiff, | ) | File No. 21-CR-196(1) (PJS/TNL) |
| vs. | ) | Minneapolis, Minnesota May 28, 2024 3:54 p.m. Courtroom 15 |
| Charles Randall Sorensen, Defendant. | ) | |

---

BEFORE THE HONORABLE PATRICK J. SCHILTZ and a Jury
UNITED STATES DISTRICT COURT CHIEF JUDGE
**(TESTIMONY OF WITNESS JONNA LOVE)**

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | Assistant United States Attorney<br>MICHAEL MCBRIDE, ESQ.<br>CAMPBELL WARNER, ESQ.<br>300 South Fourth Street<br>Suite 600<br>Minneapolis, Minnesota 55415 |
| Defendant appearing Pro Se: | CHARLES SORENSEN, Pro Se |
| Standby Counsel: | Berglund, Baumgartner, & Glaser, LLC<br>KURT B. GLASER, ESQ.<br>333 Washington Avenue, Suite 405<br>Minneapolis, MN 55401-1370 |
| Court Reporter: | MARIA V. WEINBECK, RMR-FCRR<br>1005 U.S. Courthouse<br>300 South Fourth Street<br>Minneapolis, Minnesota 55415 |

Proceedings reported by court reporter; transcript produced by computer.

**P R O C E E D I N G S**

**IN OPEN COURT**

**(Testimony of Jonna Love)**

**IN OPEN COURT WITH JURY PRESENT**

MR. MCBRIDE: Your Honor, the government's next witness is Ms. Love. She was a little delayed on her plane, so I think she is here but.

THE COURT: Do you want to go check?

MR. MCBRIDE: Yes, Your Honor, if I may.

THE COURT: Okay, go ahead.

MR. MCBRIDE: She's here, Your Honor.

THE COURT: Okay. Ms. Love, come up to the front of the courtroom please, and I'll get you sworn in.

**JONNA LOVE,**

Whereupon, having been duly sworn upon her oath, testified as follows:

THE COURT: All right. Have a seat up here, please.

Could you start by telling us your first and last name and spell your last name.

THE WITNESS: Jonna Love, L-o-v-e.

THE COURT: Thank you. Mr. McBride?

MR. MCBRIDE: Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. MCBRIDE:

Q. Good afternoon, Ms. Love. How are you?

A. I'm good. How are you?

Q. A little bit of a whirlwind to get here, right?

A. Yes.

Q. When did you arrive in Minnesota?

A. 2 o'clock.

Q. All right. Well, I appreciate you scrambling to get over here. Where do you work?

A. The Internal Revenue Service.

Q. And how long have you worked for the IRS?

A. 25 years.

Q. What is your current title?

A. Frivolous Return Program Coordinator.

Q. What is a Frivolous Return Program Coordinator?

A. We are tasked with reviewing every return that is sent to the Frivolous Return Department to ensure that they qualify for the 6702 penalty.

Q. We'll break it down a little bit further later on but suffice it to say there's a penalty if you send in qualifying frivolous correspondence?

A. Yes.

Q. How long have you had that position?

A. So I was recently selected for the permanent position.

However, I was detailed on and off for the last four years.
Q. And when you weren't working in the frivolous return program, what were your duties at the IRS?
A. When I wasn't in the?
Q. I'm sorry, it was a terrible question. Before that, what did you do in the IRS?
A. I worked in informant's claims and files.
Q. All right. Now, let's talk about the Frivolous Filer Program. What is it again?
A. The Frivolous Filer Program was designed to stop fraud and abuse of the frivolous return filings.
Q. And how is a filing determined to be frivolous?
A. There must be a desire to delay or impede the administration tax laws. So most of these types of returns filers say that taxes are unconstitutional, wages are not income or they're just trying to get a refund that they're not entitled to.
Q. Now, if you determine that something a person sends in is frivolous, do you tell them?
A. Yes, we do send a letter.
Q. What is that letter?
A. The 3176.
Q. All right. And we'll come back to that a little bit later but that's the sort of title of the letter, the form?
A. Yes.

Q. All right. Are frivolous filings stored by the IRS?
A. Are they stored?
Q. Like when somebody sends in correspondence, does the IRS keep a copy?
A. The first piece of correspondence is scanned on to a system, yes.
Q. But are all frivolous correspondence that come in from a person kept?
A. It depends on what type it is. Some of it is sent to the LDC, the Lead Development Center or, sorry, the KDIC.
Q. So is it true that some correspondence might be saved, some correspondence might not?
A. Yes. Absolutely, yes.
Q. Well, let's turn, and I want to talk about tax audits. Everybody's favorite subject, okay? Have you worked as a tax examiner at the IRS?
A. Yes.
Q. And what does a tax examiner do?
A. We review financial information on the taxpayer's account to ensure that the income reported on the return matches what was reported to us.
Q. And so just to be clear, what are the two things that you're comparing when you do a tax examination?
A. W-2 information and withholding information reported on the return and on our system.

Q. So do you compare the return with what the employer or financial institution reported?

A. Yes.

Q. All right. If you see -- if you see someone using the language "demand lawful money on a return", does that raise a red flag for you?

A. Absolutely, yes.

Q. Why is that?

A. Well, that's one of the key words that we -- or key phrases that we look for.

Q. Do you have any idea what it means?

A. Well, lawful money is currency issued by the United States Treasury, and it is used a few different ways, the demand for lawful money. Sometimes they're demanding that all of their withholding is given back to them or --

DEFENDANT SORENSEN: Your Honor, objection, this is expert witness testimony.

THE COURT: I think it's just describing her experiences at work, so I think it's okay.

DEFENDANT SORENSEN: Well, what is lawful money?

THE COURT: Well, I think she was describing what people mean when they say that, what she would know from her work, so I think that's okay.

MR. MCBRIDE: All right.

BY MR. MCBRIDE:

Q. What documents do you prepare as part of a tax examination?
A. The examination report, the Form 4549.
Q. And once you've completed your examination, does a notice get generated and sent out to the individual?
A. Yes.
Q. What is that?
A. After it's assessed?
Q. Correct. Yes, so I'm sorry, this is the 525 letter?
A. Oh, yes. We're just proposing to change the tax return at that time so we would issue the letter 525 with their report.
Q. So you would send out those two documents to the individual?
A. Yes.
Q. Under ordinary circumstances, how long after a person receives one of these 525 letters do they have to correct the return before collections can begin?
A. Well, they have 30 days to provide supporting documentation. If we don't receive that, then we issue them another letter, which is called a Statutory Notice of Deficiency. That is a 90-day letter where the taxpayer has 90 days to petition tax court or to provide additional supporting documentation.
Q. And so if an individual disagrees with the examination

changes that you've proposed, they have those avenues to address it?
A. Yes.
Q. What is a jeopardy assessment?
A. A jeopardy assessment is an assessment made on an erroneous refund over $40,000.
Q. When you say an "erroneous refund", what does it mean?
A. It means that it's money that does not belong to the taxpayer.
Q. So, for example, if somebody sent in a return and got a refund, and the return was wrong or bad or fraudulent and the refund was over $40,000, that might be made a jeopardy assessment?
A. Yes.
Q. How does that change the timing to when the IRS can begin collecting?
A. Well, that's why we do the jeopardy assessment so that a revenue officer can go out immediately and start collecting.
Q. So instead of that 30 days and then 90 days, they can just go out right away?
A. Yes.
Q. If a jeopardy assessment is made, is an individual still able to follow those other steps to contest the changes that you might propose?
A. Yes.

Q. All right. So I want to turn to this case. In 2017, were you still working at that Frivolous Return Program?
A. Yes.
Q. When did you begin -- were you assigned to review any returns by Mr. Sorensen?
A. Yes.
Q. For what tax years?
A. 2015 and 2016.
Q. Do you recall the timing when you actually conducted your reviews?
A. Like the date?
Q. Yes, approximately?
A. I believe it was I want to say late June or early July of 2017.
Q. And did you determine whether his returns contained frivolous or anti-tax positions?
A. Yes.
Q. All right. So I want to break them down. I want to bring up Government Exhibit 28. Is this one of the returns that you examined?
A. Yes.
Q. Now, what did you compare the income Mr. Sorensen claimed in this return against?
A. The information reported to us through the Social Security Administration.

Q. And so here I want to zoom in. Mr. Sorensen reported receiving $220,000 in W-2 earnings; is that right?
A. Yes.
Q. And then he had no other income that he reported?
A. Correct.
Q. And we'll come back and talk about these two negative numbers at the bottom in a second. I'll bring up Government Exhibit 23, which has already been admitted. Do you know what this is?
A. It appears to be a transcript.
Q. Is this one that shows --
A. The W-2 information.
Q. And is this social security number for the taxpayer; is that correct?
A. Yes.
Q. All right. So I want to look here at the first section of income, what does this show?
A. The taxpayer worked for Delta pilot, plus the employee information, their address, and wages, tips and other compensation in the amount of 53,971 and then federal income tax withholding of 16,246.
Q. Now, this is broken up on two pages here, but down at the bottom, we see another heading for W-2 income also from Delta Airlines; is that right?
A. Yes.

Q. Is this the same thing or is this a separate W-2 earnings? I'm sorry, let me page down and that may help.
A. I believe that would be a different one.
Q. All right. So we see here in line 1 it has wages, tips and other compensation, how much was on this W-2?
A. 220,914.
Q. And then below it it had income tax withheld and how much?
A. 56,068.
Q. So loosely if we add those up, that's not 220,000, which we saw on the tax return; is that right?
A. Right.
Q. We'll get to your examination, but it's about $53,000 more than that?
A. Correct.
Q. And then there are a couple of other things here. This is a 1099. What does a 1099 report income for? I'm sorry, this is a 5498, what is that?
A. Individual Retirement Arrangement contribution information.
Q. But here we see there was effectively not much; is that right?
A. Correct.
Q. Down here we have 1099-INT?
A. Interest.

Q. So this is interest income?
A. Yes.
Q. And then if we go down another page, we see there's effectively not very much; is that right?
A. Yes.
Q. The same thing for the next 1099, but down here, we have another entry here. What is this 1099 for?
A. An IRA distribution.
Q. What is an IRA? Just generally?
A. Individual Retirement Account.
Q. It's a retirement account?
A. Yes.
Q. Here it's the Defense Financing and Accounting Service, so this is like retired military pay; is that right?
A. Correct.
Q. And if we look down here, how much of that retired military pay was taxable?
A. 18,889.
Q. All right. So if we go back to Exhibit 20A, we see that some of those income amounts are missing from here; is that correct?
A. Correct.
Q. All right. Now, I want to come down here to this section. What is this?
A. It is a loss being claimed on line 21 in the amount of

320,972.
Q. And under --
DEFENDANT SORENSEN: Objection, Your Honor. This is expert testimony.
THE COURT: Overruled. The answer will stand.
BY MR. MCBRIDE:
Q. Now, speaking generally, what is a loss?
A. A loss would go against the reported income.
Q. Can you give some examples of losses that you see?
A. A lot of times you would have expenses like if you had a Schedule C, you could claim those expenses against your W-2.
Q. I'm going to go to page 7 here. Is this the schedule where Mr. Sorensen was justifying supporting his purported loss?
A. Right.
Q. And what do we see in line 1?
A. Demand for lawful money.
Q. Is that a loss?
A. No.
Q. Is it appropriate to claim a loss for demanding lawful money?
A. No.
Q. Now, have you seen that before?
A. All the time.
Q. Where do you see it?

A. In the Frivolous Filer Department.
Q. All right. I'm going to bring up Government Exhibit 33 now. What is this?
A. This is an examination report that I prepared.
Q. And what is this examination report for?
A. Proposing changes to the taxpayer's return.
Q. So in this case, what period do we see?
A. 2015.
Q. And the name of the individual you were examining?
A. Charles R. Sorensen.
Q. So this is for and then I guess the return form up at the top is 1040?
A. Correct.
Q. So if I put all those things together, you are using this form to do the examination and propose changes to Mr. Sorensen's tax return that we were just looking at?
A. Yes.
Q. For 2015. All right. We went through everything in the documents, but just briefly, what's up in this area in Box 1.
A. So we're proposing to add the unreported IRA distribution, disallow the other income loss on line 21, add the taxable interest that was unreported, add the wages, W-2 wages that were unreported and then disallow the exemption as he's no longer entitled to.

Q. And so where did the information for all these things come from?
A. So employers send W-2 information --
DEFENDANT SORENSEN: Objection, Your Honor, this is still expert testimony.
THE COURT: She's describing what she did in her job. That's not expert testimony. You can go ahead and answer.
THE WITNESS: I'm sorry, could you repeat the question?
BY MR. MCBRIDE:
Q. Is this coming from that same information that we just looked at on that account transcript?
A. Yes, yes. Thank you.
Q. This is basically your worksheet for coming up with what his taxes should have been in 2015?
A. Yes.
Q. All right. If we come down to this lines 4, 5, 6 and 7, what are these showing?
A. This is showing the corrected taxable income that we're proposing to change and the corrected tax liability that we are proposing to change.
Q. When you say "the tax liability", what does that mean in laymen's terms?
A. The tax on the earned income that he made.

Q. This is what he owed the IRS?
A. Yes.
Q. For 2015?
A. Correct.
Q. Now, what do we see on line 15?
A. Adjustments to prepayment credits are frozen refunds.
Q. And so what do we end up here in box 16?
A. The balance due.
Q. And so in laymen terms, that's the amount of taxes he owes after you make the corrections?
A. Yes.
Q. Now, on page 2 in Box 17, what are these?
A. So the delinquency penalty is applied because the return was filed late. The accuracy penalty is a 20 percent penalty based off of like a substantial understatement of withholdings.
Q. So these are penalties because he filled out his 1040 wrong?
A. Correct.
Q. And the total is here for those two?
A. Correct.
Q. All right. So Box 19, this is sort of the bottom line for Mr. Sorensen for tax year 2015?
A. Yes.
Q. And you're adding up and subtracting all the things or I

guess here just adding up all the money he owes for tax year 2015?
A. Correct.
Q. And what was the total?
A. $64,237.21.
Q. All right. When you completed your examination, did you put together a 525 letter for tax year 2015?
A. Yes.
Q. I'm going to show you Government Exhibit 32. What is this?
A. This is the letter 525. And it shows what the balance is owing, and it tells the taxpayer what they need to do and if they agree with the changes or do not agree.
Q. So I'm going to go up here. What is this date?
A. That's the letter date.
Q. This is the date that it was printed and put in the mail?
A. Yes.
Q. And what does this date tell us?
A. The tax period.
Q. So this is the year you were examining?
A. Correct.
Q. And then we see down here what you were talking about the amount he owes for tax year 2015?
A. Yes.

Q. What is the purpose of this paragraph?
A. If they don't agree, they can provide supporting documentation.
Q. And so what is a person supposed to do if they disagree with the changes that you've made?
A. Provide supporting documentation.
Q. And did you send this letter out with that worksheet that we were just looking at to Mr. Sorensen?
A. Yes.
Q. All right. This won't be the most interesting thing in the world, but I want to do it all again. Okay?
A. Okay.
Q. Let's talk about 2016. I'm showing you Government Exhibit 46. What is this?
A. Form 1040 for 2016. Submitted by Charles R. Sorensen.
Q. So this is Mr. Sorensen's tax return for tax year 2016?
A. Yes.
Q. All right. Here in the middle there's a little stamp here that says received July 19, 2017, by FRP. What's FRP?
A. Frivolous Return Program.
Q. And there's a lot of other markings on this one. Were those made by Mr. Sorensen or would those have been made during this examination process that we're talking about?
A. It would have been made during the examination process.
Q. For example, up here we have?

A. Document locator number.
Q. And some annotations here?
A. That would have been in code and edit.
Q. All right. So is this, other than all the additions to it, the notes that are on it, is this what you examined for Mr. Sorensen's 2016 tax year?
A. Yes.
Q. All right. What does line 7 here show for 2016?
A. W-2 wages in the amount of $454,483.
Q. And down here we see in line 16 some additional income, what is that income for?
A. Pension and annuities.
Q. Now, I'm going to bring up Government Exhibit 38, this is the wage and income transcript for Mr. Sorensen for 2016; is that right?
A. Yes.
Q. Now, we won't go line by line like we did last time, but when you reviewed this, he actually got his income right; is that right?
A. Correct.
Q. But if we go back to Government Exhibit 46, there's again other income listed here of negative $686,508. What is that?
A. It's a loss he's claiming to reduce his taxable income.
Q. And how far did that reduce it there in line 22?

A. Down to negative $167,289.
Q. Which is to stay that the IRS is going to have to cut him a check again; is that right?
A. Correct.
Q. So if we come down here -- I'm sorry.
All right. So this is actually what is actually page 2 of the 1040, right?
A. Yes.
Q. What were some of those other documents that we saw in between?
A. W-2's.
Q. All right. So if we come down here, what does this show based on Mr. Sorensen's calculations should happen?
A. He should get a refund for $123,370.
Q. If we go to page 6, this is again where he provides the supporting information for that loss?
A. Right.
Q. And what again does it show?
A. Demand for lawful money.
Q. In 2016, was demanding lawful money any more of a valid reason to claim a loss than it was in 2015?
A. No.
Q. I'm showing you Government Exhibit 50. Do you recognize this document?
A. Yes.

Q. What is this?
A. This is my examination report where I'm proposing to disallow the other income loss.
Q. Yes, sorry, I kind of got ahead of myself here, but, basically, what were the changes that you were suggesting?
A. To remove the loss and remove the exemptions.
Q. And so if we come down here, after you ran the tax tables on his real income, what should have happened for 2016 for Mr. Sorensen?
A. Well, this shows his corrected tax liability of $175,949, so that's what he should have reported on his return.
Q. All right. So down here at the bottom, what is this balance due that we see?
A. His correct tax liability.
Q. All right. We go on page 2, can you just briefly explain what this is for?
A. This is an accuracy penalty because the amount is excessive, we feel that this penalty applies because he was negligent in how he filed his return.
Q. And so this is a $35,000 penalty?
A. It's 20 percent of the tax, yes.
Q. So at the end of the day, after your examination, what did Mr. Sorensen owe the IRS for tax year 2016?
A. $213,769.56.

Q. Now, in Government Exhibit 49, this is a 525 letter again?
A. Yes.
Q. And this was issued on the same day as the 2015 one?
A. Yes.
Q. Were you doing these at the same time?
A. Yes.
Q. And so what did you determine and tell Mr. Sorensen he owed the federal government?
A. $213,769.56.
Q. And again on page 2, this part of the letter told him what he needed to do if he disagreed with those changes, right?
A. Correct.
Q. Now, was Mr. Sorensen also assessed frivolous filer penalties for these and other false returns -- or not false, but other returns that he submitted?
A. Yes.
Q. We'll discuss those with a later witness, but I want to give an example of one of those letters. I'm going to show you Government Exhibit 56, which has previously been admitted. I'm going to zoom in here because the format the IRS saves these in is not particularly readable. What is this?
A. This is a response to the 3176 letter.

Q. Well, I should say underneath the refusal for cause, what is it?
A. I'm sorry. I don't understand your question.
Q. The IRS letter here, what is this letter for?
A. The 3176 is sent to the taxpayer to inform them that they have filed a frivolous return, and it allows 30 days to correct that filing.
Q. And so this one in particular we can see was focused on his 2016 tax return; is that right?
A. Yes.
Q. And is that the one that we just reviewed?
A. Yes.
Q. Now, this letter was sent out, what's the date up there in the upper right hand corner?
A. August 9, 2017.
Q. Now, that's after you have completed your examination and everything, right?
A. Correct.
Q. Now, I take it when this letter went out, it did not have "refusal for cause" scribbled on the top of it?
A. No.
Q. But is this -- is this a document that got sent back to the IRS?
A. Yes.
Q. And we can see here there's some of these stamps on

there. Up at the top it says, "Received August 31, 2017, FRP," what is the FRP?

A. Frivolous Return Program.

Q. So it came right back to where it started, huh?

A. Yes.

Q. All right.

THE COURT: Can I see the counsel at sidebar for a moment, please?

**(Side-bar discussion.)**

THE COURT: So we're coming up on 4:30, how much longer do you have with her?

MR. MCBRIDE: Honestly, Your Honor, I have like four questions left.

THE COURT: Okay. Do you plan to ask her any questions, Mr. Sorensen?

DEFENDANT SORENSEN: No, I don't.

THE COURT: Okay. So let's go ahead and just finish her up so we don't have to have her come back tomorrow then.

MR. MCBRIDE: Yes, Your Honor.

THE COURT: Thank you.

(IN OPEN COURT)

THE COURT: All right. So, members of the jury, Mr. McBride has just a handful more questions and then Mr. Sorensen at this point doesn't intend to ask any

questions, so I'm going to let the witness finish up so she doesn't have to come back tomorrow. Okay? It will just be a couple more minutes. All right. Mr. McBride?

MR. MCBRIDE: Thank you, Your Honor.

BY MR. MCBRIDE:

Q. And I'm going to highlight on page 6 of this document, I realize that it appears to be a court document, but whose name is there above the "V" in the caption heading here?

A. In the middle? Charles Randall.

Q. Correct, yes. Sorry, I didn't mean the treasury secretary.

And then down at the bottom, whose signature is that?

A. Charles Randall.

Q. All right. Now, was that everything we just went through, did you do anything else in this particular case?

A. I believe I -- I'm not a hundred percent sure if I'm the one who did the jeopardy assessment but.

Q. Do you know that a jeopardy assessment was made in this case?

A. Yes, yes.

Q. And at that point what do you do? After you've completed your examination, the jeopardy assessment is made, who do you turn it off to?

A. The Collections Department.

Q. And what does Collections do?
A. They collect the money.
Q. All those taxes that you had determined were owed?
A. Yes.

MR. MCBRIDE: All right. Thank you, Your Honor. No further questions.

THE COURT: Thank you. And, Mr. Sorensen, did you have any questions?

DEFENDANT SORENSEN: No, Your Honor.

THE COURT: All right. Thank you.

You are excused. Thank you for coming in today. I'm glad you were able to make it with your flight.

THE WITNESS: Thank you.

THE COURT: Members of the jury, we'll go ahead and break for the evening. Please remember overnight not to discuss this case with anyone, including your family and friends. Let me know if anybody tries to talk to you about this case. You need to keep an open mind about the case.

I would like you back in the jury room no later than 8:15 a.m. tomorrow morning. All right. And as I said, we won't go past 2:00 tomorrow, so you can plan your late afternoon. So have a good night. We'll see you at 8:15 a.m. in the jury room tomorrow.

(Jury out at 4:31 p.m.)

(IN OPEN COURT WITHOUT JURY PRESENT)

THE COURT: You can be seated. Does the government have anything you need to raise with me before you leave for the night?

MR. MCBRIDE: No, Your Honor.

THE COURT: And did you have anything Mr. Sorensen?

DEFENDANT SORENSEN: No.

THE COURT: Let me briefly inform you of some research we've done. So during the lunch break, I did some research on this expert witness issue. My clerks have been researching during the day and sending me cases and summaries and stuff, and it looks to me like there really isn't a clear line on this.

IRS employees are allowed to testify all the time without being certified as expert witnesses or disclosed as expert witnesses, but they can only testify up to a point, and beyond that, if they haven't been disclosed as an expert they can't testify. And roughly speaking, the line seems to be that if what the IRS agent is testifying about is the kind of thing that a reasonably intelligent taxpayer who sits down in April and does her own tax returns would know, or if all they're doing is saying, you know, we're pulling income numbers off of W-2's, 1099's, adding them up, taking a standard deduction and applying the tax table, that type of thing the IRS agent is not required to be disclosed as an

expert witness.

If it gets into something more sophisticated like, you know, there was earnings paid based on oil out of an oil well, and there's a dispute over whether this is an oil royalty or whether it's, you know, something else. If it gets to something that an average taxpayer would say, what, when they sit down and do their tax return, they can't testify about that without being an expert. And so there's nothing I can do except just listen to the scope question by question.

Most of what I heard today doesn't sound to me like under the case law has to be delivered by an expert. That is they're talking about pulling numbers off of 1099's, pulling numbers off of W-2's. There doesn't seem to be any sophisticated application of expertise. It's literally just pulling numbers, adding numbers, applying tax tables, and that all seems to be within the range of testimony that can be given by someone who has not been disclosed as an expert witness.

So I'll just continue to listen to the questions and rule on objections as they're made but that's my conclusion. We're going to keep looking at it overnight. If I change my mind by tomorrow, I'll certainly let you know but that's where I come down on this issue.

All right. That's all I have for you. So please

be here at 8:15 tomorrow. I'll come out then to see if there's anything I need to address. If not, we'll go get the jury and bring them in. And what are you looking at, do you think, for the rest of your case here timing-wise?

MR. MCBRIDE: Your Honor, if we had a full day tomorrow, we'll definitely finish. I am hopeful that we may still finish but Special Agent Leach's summary at the end is going to be quite long, so we may get halfway through him, but I suspect we'll be able to get through most of the other witnesses.

THE COURT: Okay. I think what I'll do then is we'll take an early lunch tomorrow like 11:30 or so, and I'll make it a short lunch like 45 minutes or so and have them come back, go until 2:00, and then we'll leave at 2:00.

Okay. Have a good evening, and I will see you at 8:15 tomorrow here in the courtroom. Feel free to pack up and leave.

(Court adjourned at 4:35 p.m.)

* * * * *

**REPORTER'S CERTIFICATE**

I, MARIA V. WEINBECK, RMR, FCRR, certify that the foregoing is a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript from the proceedings produced to the best of my ability.

Certified by: *s/ Maria V. Weinbeck*
Maria V. Weinbeck, RMR-FCRR